I have to make my little statement on the record here. As you can see, I am here alone. And that was unforeseen circumstances that the other, my other two colleagues were unable to be here today. And I think that you've been apprised of this. I wasn't. Okay. And There's no problem with that. Okay. And of course, as you know, they will have read the briefs, they've been assigning cases, and they will hear the tapes. So you may proceed, Mr. Daly, on the case of, and we are here on the State v. Mark Taylor. You may proceed. Thank you, Madam. May it please the Court and the Council. This is an appeal by the State from a ruling of the Circuit Court suppressing the confession of defendant Mark Taylor, an 18-year-old, a young adult at the time. The Court's finding was that the defendant did not have the intellectual capacity to understand and knowingly waive his Miranda rights. In this case, there are actually two suppression hearings. The first one was more of a standard garden variety type of police coercion, environmental difficulties, cold, et cetera, et cetera. They all went to a hearing. There was a recording of the interrogation. It was being a murder case, so it was required. And the court in that case ultimately found in favor of the State, who denied the motion to suppress, making comments I think that are perhaps germane to an extent in this particular hearing, that the courts will say visceral impressions at the time, but the defendant appeared to be mature beyond his years, and he also appears to be intelligent enough to understand what is going on. Is this the same judge? I was trying to remember that, Your Honor, but I don't recall. So I can't tell you that it is for sure. And I don't necessarily mean to say that from the sense that we have the same judge in there for some sort of kind of reason to cobble things as we go through the case, but it's interesting from a visceral impression standpoint because it does tie into an argument that the State makes with regards to the importance of looking at the DVD and the interrogation itself in the context of the allegation that the defendant did not have the intellectual capacity to understand and waive Miranda. Now, this is a case of experts, as it often is. The State's expert was Dr. Angeline Stanislaus, a board-certified psychiatrist out of St. Louis. And the defendant's expert was Dr. Kazimichi, who was a clinical psychologist. And, of course, as we know, in any kind of Fifth Amendment issue, the State bears the burden of proof. And the State's burden of proof is by her comments of it, which essentially means it's more likely to be a proven particular fact than not. And so the standard is relatively low, but it is the State's burden of proof. And so the State presented Dr. Stanislaus as evidence. She actually first became involved in the case for a fitness hearing to determine whether the defendant should have a fitness hearing. We have a statutory provision where you examine the defendant to see where a fitness determination should be made. She found that the defendant was fit. And then she was brought back after the defendant had filed a second motion to suppress the alleging this intellectual deficit in order to assess whether the defendant had the intellectual capacity to waive Miranda. Now, I won't sit here and insult the court by saying that she was the perfect witness in the world. There were certain aspects of it that if I had been a prosecutor, I probably would have pressed her on it a little bit more. But she did come to a clinical finding that he was capable of waiving his Miranda rights. And she used whatever evaluation she did for the fitness. She used the fitness, but also listened to, did not watch. For some reason, she was able to get the video, but did listen to the interrogation. Reviewed Dr. Kosmicki's reports, of course. And made her assessment based upon her observations and impressions of the interrogation itself as she listened to it. And, of course, that is our position. It needs to be combined, I think, with certain aspects of the fitness determination, which I think are relevant to the overall picture of disability. Did she administer any tests then? She did not. In fact, she did not actually speak to the defendant again after the fitness interview. Okay. So among the problems that we'll go ahead and get up front, she didn't speak to him again. Nor did she do what we refer to here as the Grisso test. The Grisso? The Grisso test, yes. It's a four-part test that basically, I don't want to get into the details of it, but it's specifically geared towards addressing that particular issue. But neither did Dr. Kosmicki. Neither did Dr. Kosmicki. No, no. In fact, we'll go ahead and state straight up front, Dr. Kosmicki actually never gave an opinion at all about the defendant's ability to understand and waive Miranda. He was not called to make that. He did not review the interrogation or do anything else. Okay. His testimony is strictly related to testing that he did about three to four years prior. It was probably a DC bus referral in June, I think. So when you look at Dr. Stanislaus's report in total, both from fitness and from the aspect of the Miranda, she characterized the defendant as cooperative, pleasant, coherent, logical and goal-oriented. He demonstrated no outward sign of cognitive deficit. He was focused and could concentrate, which is an interesting point because one of the things that Dr. Kosmicki testified to is that he would lose focus and would have some kind of deficits in terms of sequential numbers or times and things of that nature. She did a four axis diagnosis, did the diagnosis and then suffered from mild mental retardation based on the 2008 IQ test, which would be a test that most likely Dr. Kosmicki had administered to him back in 2008. She discussed his hearing of the discussion of the Miranda rights with him, his sense and his understanding. One particularly important aspect of Dr. Stanislaus was the defendant's ability to provide extensive narrative answers to inquiries from the police officers. I bring that up because it's important because one of Dr. Kosmicki's, I think, correct generalizations of lower IQ individuals is a tendency to be acquiescent to authority. You'll see in the case law that there are individuals of lower IQ who tend to see authority and say yes, sir, no, sir, that's right. Of course, that often is a very significant component of understanding the full spectrum of their cognitive abilities to understand the proceedings and to process something like the right to decide. Well, when he answered every question with respect to his understanding, didn't he basically say okay? Yeah, he did. And isn't that a form of acquiescence as well? Well, it's a form of acquiescence, but let's be very careful about how we characterize that type of acquiescence. I'm a person, I guess, of reasonably average intelligence, and I would probably say yes as well. And I thought about that, not about your intelligence, but I thought about the fact that it almost makes that statement meaningless unless you can delve into it and understand it. He could have had a 30 IQ and said okay. But there's no obligation on the part of investigators to do that. I understand. Okay. And at this point, of course, the police had no reason to believe that he suffered from any cognitive deficit. The trial judge at the first suppression hearing didn't get any impression of any cognitive deficit. So then when we get to the second project, all of a sudden what seemed like normal responses of police officers became parroting of the police officers. And so I find myself highly suspicious of that particular judicial finding because it's... Well, the judicial finding was probably based on his reliance on Dr. K. Cosmikin. Saying that it really doesn't have any meaning when you say okay and you don't know whether or not they have the mental ability to understand what the question was. That's not exactly what he said. Something along those lines. What he said was that it's indicative of... I'll grant you that, at least for the context of this argument. I may be missing something from my recollection of his testimony specifically. But it is also, I think, you need to place it in this particular context of if you're just looking at when his handwriting sheet of paper, when he's read, okay, here's your first right. And he's allowed to read it and it's explained to him. He says, do you understand? And he says, okay. And he says, yes, or whatever. But then it doesn't end there. Then you have everything that happens after, which is why all Fifth Amendment analyses are dependent on the totality of circumstances. If indeed he were of an acquiescent personality, it would stand to logic that that acquiescent personality would manifest itself throughout the course of the interrogation. It wasn't a long and particularly brutal one, but it was antagonistic enough that when you watch the video, maybe you already have your own, I don't know. But when you do, you will see that it was pretty much a standard type of interrogation where tell me what happened. And he'd give answers. And then he'd confront him with inconsistencies. And then he would get argumentative and say, okay, well, this is really what happened. It went back and forth and back and forth. And he did a lot to try to sort of tailor the facts to sort of minimize his own participation and maximize others, including some guy named Drosky, who was sort of the ringleader of the whole operation, I guess. I don't know if there really was a Drosky or not. Eventually, as a lot of people do, they get sort of caught up in their own lives and then he ultimately loses participation. But I make this point because it's very important, because if he did indeed have this sort of agnostic personality, that we're going to describe just affirmative responses to questions about your understanding of Miranda rights and say, bam, that's it. Obviously, he has an agnostic personality. Why don't you ever say that to the rest of us interrogation? He fought with these guys over and over and over again. He had the opposite of an agnostic personality. He did everything he darn well could to convince these police officers, two of them, that they just had the wrong guys, wrong story, wrong facts, wrong everything. And that's why I think that Dr. Stanislaus' observations about the narrative responses that he gave is particularly relevant in that context of assessing his cognitive abilities. And I think it diminishes the impact of Dr. Kosmicki's more or less generalization of low IQs. Again, I say it's often correct, but it's not always correct. What we have in this situation is a defendant who obviously never appeared particularly uncomfortable talking to the police. He was, you know, he spoke in a very, you'll hear this, he speaks in a very soft tone of voice. But then when he would get anxious or excited about something, he would get a little more animated. And there's a part where the police walk out of the interrogation room, he's sitting there shaking his head like, I can't believe these guys don't believe me. And so, you know, there's a lot going on there that it's really, I think, consistent maybe with the circuit court's initial impression of the defendant when he said he seemed to be a reasonably intelligent guy. Well, it's an interesting contrast and it's maybe hard to reconcile logically, but a low IQ is not the end-all, be-all of determining the defendant's ability to understand and believe Moran. Now, Dr. Kosmicki, he was a good witness. I'll tell you that right now. From a pure witness standpoint, there's little doubt when you read the transcript, even from a whole transcript, he just seemed better than Dr. Stanislaus in these interrogations. Well, the court seemed to be pretty impressed. The court seemed to be pretty impressed, right. I had not heard him or read the transcript. The bail of experts is not a popularity contest. Right. And the bail of experts is not if I say more and do more tests, I must be right. Okay. Again, it's a totality of the circumstances. But also, I think if you really sort of parse through Dr. Kosmicki's, what he did, there's issues there. I think the other way was against what the state did present, and I think it was from a stance from the videotape of the confession itself, or the interrogation itself. Now, several of the tests that he did related directly to the defendant's intelligence and intelligence IQ. That is what it is. And even Dr. Stanislaus accepted that particular finding as an aspect of her impressions of the defendant in making her determination. Although she says he's just mildly retarded. Yeah, I think Dr. Kosmicki referred to him as a mid- or low-level. Moderate. Yeah, he's moderate. Yeah, so they're not really too far apart, I suppose, in that sense of it. 62 is not going to win you any more MIT scholarships. But there are people that are demonstrably lower IQs that have still been found to be able to have a capacity to weigh Miranda. So there's no bright-line test. I guess that's the bottom line when I'm driving out here. He talked about other exams that he gave, one of which was his BASC test. But he acknowledged it was B-A-S-C. But even he acknowledged that that was more to determine behavioral and emotional functioning rather than the defendant's reasoning and intellectual skills. Did some other testing and went through it. I mean, he went through a lot of documentation. This is things that he's provided most likely by DCFS in order to provide sort of a broad-spectrum impression of him. The impressions that he gave of him at the time, I think, in terms of his particular specific aspects were that he would lose focus and would appear to be confused and things of that nature. And, of course, his references to susceptibility to authority figures is part of it. Do you think that this case differs greatly or in what way from JM? JM, if that's the one I'm thinking of. Yeah, it's a 5th District case. Yes, and I think that JM, well, first of all, JM, I think it's Dr. Conejo, did the, excuse me, he had actually come to the conclusion that he opined that the defendant could not, and I believe that was, I think that was the only expert testimony that was hanging out there in that case, that the defendant did not have the capacity to understand and cover in a random way. So, yeah, so there's a functional distinction here because, if you remember, there's only one opinion in this case about the defendant's ability to understand that. And Dr. Angelina Stanislaus has been around a lot, I don't want to get into who's on the record, but, you know, the type of whistleblower you see that day. I will say, though, that in JM it seemed pretty much based on his intellectual capacity. Correct, correct. And that's what I would say. Supported by the expert, right. I believe that there was some corroborative evidence, and I'm going to think of the other case cited by the defendant, there was maybe the other one, there was some corroboration of parroting or. . . Right, right. So I think that the cases cited by the defendant are distinguishable in that regard and also particularly distinguishable because, unlike those cases, here we have specific testimony provided by the state of an expert's testimony of a defendant's ability to understand the way we were handed. Now, of course, an expert's testimony is not the end all, be all of anything. Okay. And so I want to be careful to say that when I say that the state has this and the defendant did not have that, that's the end of the story. But it's a big part of the story. And I think that when you take that big part of the story and you combine it with what you can watch yourself from the video, and you can see that a lot of these sort of observations or generalizations that Dr. Kazimichi spoke about in a clinical setting he had with the defendant three or four years ago when the defendant was much younger and therefore, at least from an emotional standpoint, less sophisticated than he is today, that you really have to question the validity of those findings. And Dr. Kazimichi... Well, with respect to the IQ, I don't think there's any support for that. Correct. I mean, generally, once you get to... You're right. ...a certain stage, it either stays the same or lowers even. I guess I'm not arguing that per se. What I'm arguing is essentially your interactive skills with other people. Okay. I do think that that's a supportable assertion. You're correct. IQ is generally static. It might go up a little bit. And that's something that Dr. Stanislaus obviously appeared comfortable with because she didn't seem to discount his 2008 IQ as one of the four axioms of her diagnostic analysis of defendant fitness determination. So, there is one part of the direct examination of Dr. Kazimichi, which I found rather interesting. He was asked by defense counsel when he was sort of going through all these things. And it was, I believe, at the part of the testimony where he's saying, I'm not providing you nor I'm having to ask nor am I intending to provide any kind of expert opinion about his ability to waive Miranda, which I don't know how he could have not actually heard the interrogation. But the question was, so to you the most important thing is IQ? And Dr. Kazimichi's answer was yes. Now, this is a little nugget. But it's a very important nugget because what it says to me as I read this is that his broad clinical assessment of this defendant reduces down to his IQ. And he gave maybe not specific expert opinion in this case, but he gave a general expert opinion about comprehension and ability to waive Miranda based upon strictly how defendants attested on an IQ test. If that's what the defendant has going forward ultimately, then that's just not enough to overcome the evidence I've already presented on the state, which I think is certainly established by repondents of the evidence, both in combination with their expert witnesses' testimony. And their testimony is not really key. Let me – I have one minute to get these Bristow tests, okay? Okay, then I want to answer. Nobody did the Bristow tests, okay? And I'm not going to sit here and tell you exactly what they are. I would concede that is one aspect that the court can take into consideration, but did not – neither side did it, and you'll know from my brief that Bristow's coming under a little bit of heat lately from other courts. Connecticut's tossed it out completely to the Supreme Court as a scientifically reliable diagnosis. That's all I have on that. Okay, thank you. Thank you. Ms. Strong. So much for our two-minute argument.  I'm 99% sure, but I can't find a reference to it in my brief, that it was the same judge who did the first suppression hearing as did the second suppression hearing, and I can – because I was involved in it after the first suppression hearing, I can tell you how it came to be. A report made by Dr. Kosmicki was discovered – no one knew it existed – after the first suppression hearing had happened, and the evidence was reopened to consider that as newly discovered evidence, and that's why the second suppression hearing happened. At that time, the judge considered everything from the first hearing in conjunction with what was presented at the second hearing, which was essentially just these two experts. So that's how it came to be and how the judge was fully aware of everything that had happened and why his opinion changed from suppression one hearing to suppression two. One thing that is really important to remember in this case is that this is the standard that has to be applied here. This should only be reversed if it is against the manifest weight of the evidence regarding the factual findings and the credibility determinations that the trial judge made. He was very, very, very clear that he found Dr. Kosmicki more credible than Dr. Stanislaus, and he explained why. He did more tests. He had much more explanation in his answers to questions, whereas Stanislaus responded much with yes, no, because. The answers were certainly not as complete. It almost seemed as if they were talking about the same cases or the same defendant during the testimony. One thing that I don't know that has been really talked about as much as it should be and I think is really important about the credibility determinations is that Dr. Kosmicki was not hired to do these evaluations for the purpose of addressing this particular case. This child, Mark Taylor, has been involved in the state system his entire life. He has been a ward of the state, had a terrible upbringing. The evaluations that Kosmicki did in 2008 were about obtaining services for him. So they weren't made. The evaluation wasn't done with an eye to answering questions that might come up down the road, yet all of the information was gathered, much more by Kosmicki without a specific goal of addressing the question of whether he fit with his marine rights than Stanislaus bothered to do when she was hired to determine if he was fit to stand trial. I think that is absolutely vital. There was no agenda behind Kosmicki's evaluations done in 2008, none at all other than what services does this child need. Yet that's the information he relied on to determine that a person with the characteristics that Mark Taylor has could not have waived his marine rights and he was clear that the IQ was the most important factor to him but by no means was it the only factor. And the judge saw this. He ruled that it was the totality of the circumstances that led him to the conclusion that he was led to. He understood that IQ was not the only factor. And while it was the most important to Dr. Kosmicki, he also agreed that it was not the only factor. There's no doubt that a 62 IQ is very, very low. It's eight points under what qualifies you for state assistance in Illinois. You're not even really considered fit to take care of yourself. So it gives you an idea of just how low it is. But that's not all that Mark Taylor deals with. He has many mental health issues, many that go far beyond his IQ. And those were considered by Dr. Kosmicki. Again, not considered in light of what use they would be to him at a future murder trial but as a pure analysis of who he was as a 15-year-old. That's got to carry some weight, and I think it did with Judge Overstreet. He certainly was persuaded by how thorough the testing had been and not at all fazed by the fact that Kosmicki had not performed the Bristow test because why would he have? That wasn't an issue when he did his evaluations. Of course, when Dr. Stanislaus did her evaluations, it was relevant, yet she didn't perform them either. We asked her, did you review Mark Taylor's school records? No. What about his records from DCFS? No. What about just a list, 10 or 12 sets of records? No, I didn't review any of those. Dr. Kosmicki did. He had all of that to consider when he reached his conclusion long before this question ever arose. I don't know how we can argue that that is not very, very credible and extremely persuasive, and it obviously was to the trial judge. Speaking about the video, it is true that Dr. Stanislaus saw it but didn't know. She heard it but didn't see it. There was some sort of problem in the playing of the video and the interrogation. She didn't get to see body things. She could just hear his voice. Kosmicki didn't hear it at all, and he explained why he didn't care because his question was not about how Mark Taylor behaved in an hour-long video with some police. It was about who Mark Taylor is in his mind, what his capabilities are. It wasn't about a show he could put on when he's scared to death, has been on the run, and is being questioned in something that he doesn't understand. So it wasn't important to Kosmicki to see that. The judge did watch it, to be sure, and he disagreed with many of the things that the statement argued about Taylor's behavior. He did hit on the point that he said okay when he was read his Miranda rights and noted that saying okay doesn't mean he understands them. It just means he said okay. Okay, he's been told that. Okay, he acknowledges it. Without going any further into it, how could we possibly know that that meant anything? And the trial judge was clear that he was not unhappy with the way the police officers had behaved during the interview because they didn't know that Mark had these problems. They didn't know that he wasn't capable of things that any other 18-year-old being questioned would be capable of. So there was no reason for them to delve further and show that yes, I do understand what that line in the Miranda rights means. Let me ask you, did he sign a confession? I don't believe there is a signed confession. I can't answer that. Because we know he couldn't read. He couldn't read. So even if he did, what difference does it make? It would have tipped somebody off that he couldn't read. I'm curious about that. But I see confessions all the time that are signed by defendants who can't read. But in this case we know he could read at age 15 or so. He could read at a second grade level. And his IQ, as Mickey outlined, that he would probably never get beyond that stage. He doesn't have the capability to learn how to read any better than that. One thing that is important in the IQ testing is there's four types of IQ testing. And there's numbers that come up on each line. And that's how you reach the overall composite score. But the part that he tested the lowest in, the lowest one percentile of everybody, is the ability to have abstract thinking, to distinguish between concrete and abstract thinking. That's the ability to apply fact or situation right now to a bigger picture. He can't do it. 99% of the world can do it better than Mark Taylor. If that is not a suggestion that he might not have been able to understand his IQ, his Miranda warnings, in any way able to take those in, understand them, and apply those to what kind of situation he was in, I don't know what more proof we can have of that. And I certainly don't want to argue that we have to rely just on IQ because we have so much more, but that is a very powerful piece of information. No one here who didn't bother to do any testing can testify that this child in this situation with his attributes and characteristics had the ability to do any of the things that he needs to be able to do in order to waive the Miranda rights. We're not asking anybody to let him out on the street. We're not asking for that. The judge understood that this was about this kid in this situation with these characteristics, and the state just could not make its case because they didn't have the evidence to do it. We could have brought in many more experts and done more tests, but what was the point? This judge found Dr. Kosmicki to be amazingly credible, very thorough, and Dr. Stanislaus not to be. That nothing that the state has presented can show that that's against the manifest weight of the evidence. So we would ask that you would affirm the trial court's order suppressing this statement. Is there any other message I want to know, Mr. Daly? I have my iPad with me here, so I can't read. Still hearing a lot of IQ, IQ, IQ, IQ. Again, I'm not contesting that he had a low IQ. But in the long run, where counsel says IQ is not the only thing, what's not really being ever said, and what was never really explained by Dr. Kosmicki, because obviously he never rendered an expert opinion, is what does all this other non-IQ stuff have to do with his ability to understand Miranda? Well, let's talk about some of these other things. Wasn't he diagnosed with ADHD? He was diagnosed with, yeah, he had attended classes for emotionally disturbed children, I guess. He had, let's see, he was taking the drug Abilify, which I think probably goes to the attention deficit disorder. He'd been exposed to the juvenile justice system in 2005 and received probation, which ironically is probably more favorable for the state's position than anything, since at least it shows a prior exposure to the justice system. He had received some sort of individual care plan, and then some note that was part of his care plan indicates to me the fact that the defendant didn't seem to understand what was going on. I'm not sure what the context of that was, but that was one of the things that was brought up by Dr. Kosmicki. When you look at it, there's a lot there, and I don't doubt what counsel says is absolutely correct, and Dr. Stanislaus didn't look at this for that. I guess the question then follows on, and that means what? Dr. Kosmicki didn't explain it. He gave a really good recitation of all the tests that he did. He could testify for five hours if he wants to about all the tests that he did. If he doesn't say, well, this means the defendant couldn't understand it in a Miranda way, I don't understand what the point of all that testimony is, and you can't tie it up. It's just a lot of expertise without an opinion, and that's the problem the defendant has in this case. The reductio of everything is that he has a low IQ. Kosmicki admitted it himself. That's what it comes down to. I'd say it's because he had a low IQ. Well, I thought he said it was the most important factor, but I mean... Well, it's really the only factor he really identified. If there's something else that contributed to it, he didn't identify it. But again, he didn't offer an opinion one way or the other, okay? So I do want to say there's one comment here that the court stated in him that the defendant couldn't read. It's true that when the defendant was tested by Dr. Kosmicki back in 2008, he was deemed to be, I guess, based upon the criteria he was deemed to be functional, but he couldn't read at a fourth-grade level, okay? And so that is what it is, but it's also a four-year-old test. So I'm worried... Excuse me, Mr. Daley. I thought that there was testimony that somebody with a 62 IQ would not be expected to read beyond a fourth-grade level. That's the case, and I stand corrected. Yeah, I think that's what it was said. Okay, and that's fine. And that's fine. I'm just a little... And I think it just sort of ties into some concerns that I have about placing undue emphasis on examinations that are years old and the possibility of staleness, but obviously it would have been better if Dr. Stanislaus had probably sat down and read him the Miranda rights and got through that or had him explain it. Nonetheless, her opinion is what it is, and it's grounded in factual observations and expertise, a lot of which I read to you earlier during my initial presentation, and a lot of which I think specifically refute generalizations or specific observations made by Dr. Kosmicki years earlier. And I think that that's the more probative aspect of it. And as much as I like to agree with counsel that the circuit court really paid attention to the totality of the circumstances, I'm hard-pressed to come to that when really the stated reasons are that I found Kosmicki more credible because he did more tests, which means what? Okay, more tests doesn't mean... There's got to be a conclusion. Tests are just tests. Number two, the court's only basic factual connection between IQ tests and what's viewed on videotape was his assent to the Miranda questions of whether he understood, as I've already explained. That's just one part of everything that happened. And the court acknowledged that there were narrative and intelligent responses, but they seem to go over the head of the totality of the circumstances in the court's mind. I know this court's not in a position to second-guess the court, but the facts that are extant from the record can't be ignored. And if the basis of this is that the judge's feeling is that he is mentally deficient because he's only going to be capable of parroting what officers want him to say, and the record shows that it's absolutely not what happened, then that shows that, of course, finally, we're being tested against the will of the evidence. Hugely against the will of the evidence. That's all I have. Thank you very much. Thank you both for your briefs and arguments. Very interesting case. We'll take it under advisement. Thank you. That concludes arguments for today. All right.